(Slip Opinion) OCTOBER TERM, 2010 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GLOBAL-TECH APPLIANCES, INC., ET AL. *v.* SEB S. A.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 10–6.  Argued February 23, 2011—Decided May 31, 2011

After respondent SEB invented an innovative deep fryer, obtained a U. S. patent for its design, and began selling its fryer in this country, Sunbeam Products, Inc., asked petitioner Pentalpha Enterprises, Ltd., a Hong Kong home appliance maker and wholly owned subsidiary of petitioner Global-Tech Appliances, Inc., to supply Sunbeam with deep fryers meeting certain specifications.  Pentalpha purchased an SEB fryer that was made for sale in a foreign market and thus lacked U. S. patent markings, copied all but the fryer's cosmetic features, and retained an attorney to conduct a right-to-use study without telling him it had copied directly from SEB's design.  Failing to locate SEB's patent, the attorney issued an opinion letter stating that Pentalpha's deep fryer did not infringe any of the patents that he had found.  Pentalpha then started selling its fryers to Sunbeam, which resold them in this country under its own trademarks at a price that undercut SEB's.

 SEB then sued Sunbeam for patent infringement.  Though Sunbeam notified Pentalpha of the lawsuit, Pentalpha went on to sell its fryers to other companies, which resold them in the U. S. market under their respective trademarks.  After settling the Sunbeam lawsuit, SEB sued Pentalpha, asserting, as relevant here, that it had contravened 35 U. S. C. §271(b) by actively inducing Sunbeam and the other purchasers of Pentalpha fryers to sell or offer to sell them in violation of SEB's patent rights.  The jury found for SEB on the induced infringement theory, and the District Court entered judgment for SEB.  Affirming, the Federal Circuit stated that induced infringement under §271(b) requires a showing that the alleged infringer knew or should have known that his actions would induce actual infringements; declared that this showing includes proof that the

alleged infringer knew of the patent; held that, although there was no direct evidence that Pentalpha knew of SEB's patent before it received notice of the Sunbeam suit, there was adequate proof that it deliberately disregarded a known risk that SEB had a protective patent; and said that such disregard is not different from, but a form of, actual knowledge.

*Held*:

   1. Induced infringement under §271(b) requires knowledge that the induced acts constitute patent infringement. Pp. 3–10.

   (a) Section 271(b)'s text—"[w]hoever actively induces infringement of a patent shall be liable as an infringer"—is ambiguous as to the intent needed to impose liability. In referring to a party that "induces infringement," the provision may require merely that the inducer must lead another to engage in conduct that happens to amount to infringement. On the other hand, the reference to a party that "induces infringement" may also be read to mean that the inducer must persuade another to engage in conduct that the inducer knows is infringement. Pp. 4–5.

   (b) Like §271(b)'s language, the pre-1952 case law is susceptible to conflicting interpretations. However, *Aro Mfg. Co.* v. *Convertible Top Replacement Co.*, 377 U. S. 476 *(Aro II),* resolves the question at issue. Pp. 5–8.

   (c) Induced infringement was not considered a separate theory of indirect liability in the pre-1952 case law, but was treated as evidence of "contributory infringement," *i.e.,* the aiding and abetting of direct infringement by another party. When Congress enacted §271, it separated the contributory infringement concept into two categories: induced infringement, covered by §271(b), and sale of a component of a patented invention, covered by §271(c). In the badly fractured *Aro II* decision, a majority concluded that a violator of §271(c) must know "that the combination for which his component was especially designed was both patented and infringing." 377 U. S., at 488. That conclusion, now a fixture in the law, compels this same knowledge for liability under §271(b), given that the two provisions have a common origin and create the same difficult interpretive choice. Pp. 8–10.

   2. Deliberate indifference to a known risk that a patent exists does not satisfy the knowledge required by §271(b). Nevertheless, the Federal Circuit's judgment must be affirmed because the evidence in this case was plainly sufficient to support a finding of Pentalpha's knowledge under the doctrine of willful blindness. Pp. 10–16.

   (a) The doctrine of willful blindness is well established in criminal law. Many criminal statutes require proof that a defendant acted knowingly or willfully, and courts applying the doctrine have held

Syllabus

that defendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances. The traditional rationale for the doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge. This Court endorsed a concept similar to willful blindness over a century ago in *Spurr* v. *United States*, 174 U. S. 728, 735, and every Federal Court of Appeals but one has fully embraced willful blindness. Given the doctrine's long history and wide acceptance in the Federal Judiciary, there is no reason why the doctrine should not apply in civil lawsuits for induced patent infringement under §271(b). Pp. 10–13.

(b) Although the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all agree on two basic requirements. First, the defendant must subjectively believe that there is a high probability that a fact exists. Second, the defendant must take deliberate actions to avoid learning of that fact. These requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Pp. 13–14.

(c) Although the Federal Circuit's test departs from the proper willful blindness standard in important respects, the evidence when viewed in the light most favorable to the verdict for SEB was sufficient under the correct standard. Pentalpha believed that SEB's fryer embodied advanced technology that would be valuable in the U. S. market as evidenced by its decision to copy all but the fryer's cosmetic features. Also revealing is Pentalpha's decision to copy an overseas model of SEB's fryer, aware that it would not bear U. S. patent markings. Even more telling is Pentalpha's decision not to inform its attorney that the product to be evaluated was simply a knockoff of SEB's fryer. Taken together, the evidence was more than sufficient for a jury to find that Pentalpha subjectively believed there was a high probability that SEB's fryer was patented and took deliberate steps to avoid knowing that fact, and that it therefore willfully blinded itself to the infringing nature of Sunbeam's sales. Pp. 14–16.

594 F. 3d 1360, affirmed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KENNEDY, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–6

GLOBAL-TECH APPLIANCES, INC., ET AL., PETITIONERS *v.* SEB S. A.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[May 31, 2011]

JUSTICE ALITO delivered the opinion of the Court.

We consider whether a party who "actively induces infringement of a patent" under 35 U. S. C. §271(b) must know that the induced acts constitute patent infringement.

I

This case concerns a patent for an innovative deep fryer designed by respondent SEB S. A., a French maker of home appliances. In the late 1980's, SEB invented a "cool-touch" deep fryer, that is, a deep fryer for home use with external surfaces that remain cool during the frying process. The cool-touch deep fryer consisted of a metal frying pot surrounded by a plastic outer housing. Attached to the housing was a ring that suspended the metal pot and insulated the housing from heat by separating it from the pot, creating air space between the two components. SEB obtained a U. S. patent for its design in 1991, and sometime later, SEB started manufacturing the cool-touch fryer and selling it in this country under its well-known "T-Fal" brand. Superior to other products in the American market at the time, SEB's fryer was a commercial success.

In 1997, Sunbeam Products, Inc., a U. S. competitor of SEB, asked petitioner Pentalpha Enterprises, Ltd., to supply it with deep fryers meeting certain specifications. Pentalpha is a Hong Kong maker of home appliances and a wholly owned subsidiary of petitioner Global-Tech Appliances, Inc.[1]

In order to develop a deep fryer for Sunbeam, Pentalpha purchased an SEB fryer in Hong Kong and copied all but its cosmetic features. Because the SEB fryer bought in Hong Kong was made for sale in a foreign market, it bore no U. S. patent markings. After copying SEB's design, Pentalpha retained an attorney to conduct a right-to-use study, but Pentalpha refrained from telling the attorney that its design was copied directly from SEB's.

The attorney failed to locate SEB's patent, and in August 1997 he issued an opinion letter stating that Pentalpha's deep fryer did not infringe any of the patents that he had found. That same month, Pentalpha started selling its deep fryers to Sunbeam, which resold them in the United States under its trademarks. By obtaining its product from a manufacturer with lower production costs, Sunbeam was able to undercut SEB in the U. S. market.

After SEB's customers started defecting to Sunbeam, SEB sued Sunbeam in March 1998, alleging that Sunbeam's sales infringed SEB's patent. Sunbeam notified Pentalpha of the lawsuit the following month. Undeterred, Pentalpha went on to sell deep fryers to Fingerhut Corp. and Montgomery Ward & Co., both of which resold them in the United States under their respective trademarks.

SEB settled the lawsuit with Sunbeam, and then sued Pentalpha, asserting two theories of recovery: First, SEB claimed that Pentalpha had directly infringed SEB's patent in violation of 35 U. S. C. §271(a), by selling or

––––––––––
[1] We refer to both petitioners as "Pentalpha."

offering to sell its deep fryers; and second, SEB claimed that Pentalpha had contravened §271(b) by actively inducing Sunbeam, Fingerhut, and Montgomery Ward to sell or to offer to sell Pentalpha's deep fryers in violation of SEB's patent rights.

Following a 5-day trial, the jury found for SEB on both theories and also found that Pentalpha's infringement had been willful. Pentalpha filed post-trial motions seeking a new trial or judgment as a matter of law on several grounds. As relevant here, Pentalpha argued that there was insufficient evidence to support the jury's finding of induced infringement under §271(b) because Pentalpha did not actually know of SEB's patent until it received the notice of the Sunbeam lawsuit in April 1998.

The District Court rejected Pentalpha's argument, as did the Court of Appeals for the Federal Circuit, which affirmed the judgment, *SEB S. A.* v. *Montgomery Ward & Co.,* 594 F. 3d 1360 (2010). Summarizing a recent en banc decision, the Federal Circuit stated that induced infringement under §271(b) requires a "plaintiff [to] show that the alleged infringer knew or should have known that his actions would induce actual infringements" and that this showing includes proof that the alleged infringer knew of the patent. *Id.,* at 1376. Although the record contained no direct evidence that Pentalpha knew of SEB's patent before April 1998, the court found adequate evidence to support a finding that "Pentalpha deliberately disregarded a known risk that SEB had a protective patent." *Id.,* at 1377. Such disregard, the court said, "is not different from actual knowledge, but is a form of actual knowledge." *Ibid.*

We granted certiorari. 562 U. S. ___ (2010).

## II

Pentalpha argues that active inducement liability under §271(b) requires more than deliberate indifference to a

known risk that the induced acts may violate an existing patent. Instead, Pentalpha maintains, actual knowledge of the patent is needed.

## A

In assessing Pentalpha's argument, we begin with the text of §271(b)—which is short, simple, and, with respect to the question presented in this case, inconclusive. Section 271(b) states: "Whoever actively induces infringement of a patent shall be liable as an infringer."

Although the text of §271(b) makes no mention of intent, we infer that at least some intent is required. The term "induce" means "[t]o lead on; to influence; to prevail on; to move by persuasion or influence." Webster's New International Dictionary 1269 (2d ed. 1945). The addition of the adverb "actively" suggests that the inducement must involve the taking of affirmative steps to bring about the desired result, see *id.*, at 27.

When a person actively induces another to take some action, the inducer obviously knows the action that he or she wishes to bring about. If a used car salesman induces a customer to buy a car, the salesman knows that the desired result is the purchase of the car. But what if it is said that the salesman induced the customer to buy a *damaged* car? Does this mean merely that the salesman induced the customer to purchase a car that happened to be damaged, a fact of which the salesman may have been unaware? Or does this mean that the salesman knew that the car was damaged? The statement that the salesman induced the customer to buy a damaged car is ambiguous.

So is §271(b). In referring to a party that "induces infringement," this provision may require merely that the inducer lead another to engage in conduct that happens to amount to infringement, *i.e.*, the making, using, offering to sell, selling, or importing of a patented invention. See

§271(a).[2]  On the other hand, the reference to a party that "induces infringement" may also be read to mean that the inducer must persuade another to engage in conduct that the inducer knows is infringement.  Both readings are possible.

B

Finding no definitive answer in the statutory text, we turn to the case law that predates the enactment of §271 as part the Patent Act of 1952.  As we recognized in *Aro Mfg. Co.* v. *Convertible Top Replacement Co.*, 377 U. S. 476 (1964) *(Aro II),* "[t]he section was designed to 'codify in statutory form principles of contributory infringement' which had been 'part of our law for about 80 years.'"  *Id.*, at 485–486, n. 6 (quoting H. R. Rep. No. 1923, 82d Cong., 2d Sess., 9 (1952)).

Unfortunately, the relevant pre-1952 cases are less clear than one might hope with respect to the question presented here.  Before 1952, both the conduct now covered by §271(b) (induced infringement) and the conduct now addressed by §271(c) (sale of a component of a patented invention) were viewed as falling within the overarching concept of "contributory infringement."  Cases in the latter category—*i.e.*, cases in which a party sold an item that was not itself covered by the claims of a patent but that enabled another party to make or use a patented machine, process, or combination—were more common.

The pre-1952 case law provides conflicting signals regarding the intent needed in such cases.  In an oft-cited decision, then-Judge Taft suggested that it was sufficient if the seller of the component part intended that the part

––––––––––

[2] Direct infringement has long been understood to require no more than the unauthorized use of a patented invention.  See *Aro Mfg. Co.* v. *Convertible Top Replacement Co.*, 377 U. S. 476, 484 (1964); 3 A. Deller, Walker on Patents §453, p. 1684 (1937) (hereinafter Deller).  Thus, a direct infringer's knowledge or intent is irrelevant.

be used in an invention that happened to infringe a pat-
ent.  He wrote that it was "well settled that where one
makes and sells one element of a combination covered by a
patent with the intention and for the purpose of bringing
about its use in such a combination he is guilty of con-
tributory infringement."  *Thomson-Houston Elec. Co.* v.
*Ohio Brass Co.*, 80 F. 712, 721 (CA6 1897).[3]

On the other hand, this Court, in *Henry* v. *A. B. Dick
Co.*, 224 U. S. 1 (1912), overruled on other grounds, *Motion
Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S.
502 (1917), stated that "if the defendants [who were ac-
cused of contributory infringement] *knew of the patent* and
that [the direct infringer] had unlawfully made the pat-

_____

[3] For an article that is particularly clear on this point, see H. Howson,
Paper before American Association of Inventors and Manufacturers,
Washington, D. C., Contributory Infringement of Patents 9 (Jan. 1895)
(reading late 19th-century case law to require only that a party "inten-
tionally contribut[e] to the *act*, which the Court holds to be an in-
fringement" (emphasis in original)).  Other authorities from this era
likewise suggest that it was sufficient if the seller intended a compo-
nent part to be used in a manner that happened to infringe a patent.
See, *e.g.*, *Morgan Envelope Co.* v. *Albany Perforated Wrapping Paper
Co.*, 152 U. S. 425, 433 (1894) ("There are doubtless many cases to the
effect that the manufacture and sale of a single element of a combina-
tion, with intent that it shall be united to the other elements, and so
complete the combination, is an infringement"); *Individual Drinking
Cup Co.* v. *Errett*, 297 F. 733, 739–740 (CA2 1924) ("[B]efore one may be
held for contributory infringement, it must be shown that he had
knowingly done some act without which the infringement would not
have occurred"); *New York Scaffolding Co.* v. *Whitney*, 224 F. 452, 459
(CA8 1915) ("Contributory infringement is the intentional aiding of one
person by another in the unlawful making, or selling, or using of a third
person's patented invention"); 3 Deller §507, at 1764–1765 ("[W]here a
person furnishes one part of a patented combination, intending that it
shall be assembled with the other parts thereof, and that the complete
combination shall be used or sold; that person is liable to an action, as
infringer of the patent on the complete combination"); 3 W. Robinson,
Patents §924, p. 101 (1890) ("To make or sell a single element with the
intent that it shall be united to the other elements, and so complete
the combination, is infringement").

ented article . . . with the intent and purpose that [the direct infringer] should use the infringing article . . . they would assist in her infringing use." 224 U. S., at 33 (emphasis added and deleted).[4] Our decision in *Metro-Goldwyn-Mayer Studios Inc.* v. *Grokster, Ltd.*, 545 U. S. 913 (2005), which looked to the law of contributory patent infringement for guidance in determining the standard to be applied in a case claiming contributory copyright infringement, contains dicta that may be read as interpreting the pre-1952 cases this way. In *Grokster*, we said that "[t]he inducement rule . . . premises liability on purposeful, culpable expression and conduct." *Id.*, at 937.

While both the language of §271(b) and the pre-1952 case law that this provision was meant to codify are susceptible to conflicting interpretations, our decision in *Aro II* resolves the question in this case. In *Aro II*, a majority held that a violator of §271(c) must know "that the combi-

—————

[4] The earlier case of *Cortelyou* v. *Charles Eneu Johnson & Co.*, 207 U. S. 196 (1907), contains language that may be read as adopting a similar position. In that case, the Neostyle Company had a patent for a "stencil duplicating machine" called the "rotary Neostyle," and it licensed the use of its machine pursuant to a license requiring the licensee to use only Neostyle's ink. *Id.*, at 198. Another company, Charles Eneu Johnson & Co., sold its ink to a Neostyle licensee, and Neostyle sued the Johnson company, claiming that it was "inducing a breach of the license contracts" and was thus indirectly infringing Neostyle's patent rights. *Id.*, at 199. The Court held that the defendant did not have "sufficient evidence of notice" to support liability. The Court wrote:

"True, the defendant filled a few orders for ink to be used on a rotary Neostyle, but it does not appear that it ever solicited an order for ink to be so used, *that it was ever notified by the plaintiffs of the rights which they claimed,* or that anything which it did was considered by them an infringement upon those rights." *Id.*, at 200 (emphasis added).

The italicized language above may suggest that it was necessary to show that the defendants had notice of Neostyle's patent rights. See also *Tubular Rivet & Stud Co.* v. *O'Brien,* 93 F. 200, 203 (CC Mass. 1898) ("a necessary condition of the defendant's guilt is his knowledge of the complainant's patent").

nation for which his component was especially designed was both patented and infringing," 377 U. S., at 488, and as we explain below, that conclusion compels this same knowledge for liability under §271(b).

C

As noted above, induced infringement was not considered a separate theory of indirect liability in the pre-1952 case law. Rather, it was treated as evidence of "contributory infringement," that is, the aiding and abetting of direct infringement by another party. See Lemley, Inducing Patent Infringement, 39 U. C. D. L. Rev. 225, 227 (2005). When Congress enacted §271, it separated what had previously been regarded as contributory infringement into two categories, one covered by §271(b) and the other covered by §271(c).

*Aro II* concerned §271(c), which states in relevant part:

> "Whoever offers to sell or sells . . . a component of a patented [invention] . . . , constituting a material part of the invention, *knowing the same to be especially made or especially adapted for use in an infringement* of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." (Emphasis added.)

This language contains exactly the same ambiguity as §271(b). The phrase "knowing [a component] to be especially made or especially adapted for use in an infringement" may be read to mean that a violator must know that the component is "especially adapted for use" in a product that happens to infringe a patent. Or the phrase may be read to require, in addition, knowledge of the patent's existence.

This question closely divided the *Aro II* Court. In a badly fractured decision, a majority concluded that knowl-

edge of the patent was needed. 377 U. S., at 488, and n. 8; *id.*, at 514 (White, J., concurring); *id.*, at 524–527 (Black, J., dissenting).[5] Justice Black's opinion, which explained the basis for the majority's view, concluded that the language of §271(c) supported this interpretation. See *id.*, at 525. His opinion also relied on an amendment to this language that was adopted when the bill was in committee. *Id.*, at 525–527.

Four Justices disagreed with this interpretation and would have held that a violator of §271(c) need know only that the component is specially adapted for use in a product that happens to infringe a patent. See *id.*, at 488–490, n. 8. These Justices thought that this reading was supported by the language of §271(c) and the pre-1952 case law, and they disagreed with the inference drawn by the majority from the amendment of §271(c)'s language. *Ibid.*

While there is much to be said in favor of both views expressed in *Aro II,* the "holding in *Aro II* has become a fixture in the law of contributory infringement under [section] 271(c)," 5 R. Moy, Walker on Patents §15:20, p. 15–131 (4th ed. 2009)—so much so that SEB has not asked us to overrule it, see Brief for Respondent 19, n. 3. Nor has Congress seen fit to alter §271(c)'s intent requirement in the nearly half a century since *Aro II* was decided. In light of the "'special force'" of the doctrine of *stare decisis* with regard to questions of statutory interpretation, see *John R. Sand & Gravel Co.* v. *United States*, 552 U. S. 130, 139 (2008), we proceed on the premise that §271(c) requires knowledge of the existence of the patent that is infringed.

––––––––––

[5] Although Justice Black disagreed with the judgment and was thus in dissent, he was in the majority with respect to the interpretation of §271(c), and his opinion sets out the reasoning of the majority on this point. Three other Justices joined his opinion, and a fourth, Justice White, endorsed his reasoning with respect to the interpretation of §271(c). See 377 U. S., at 514 (White, J., concurring).

Based on this premise, it follows that the same knowledge is needed for induced infringement under §271(b).  As noted, the two provisions have a common origin in the pre-1952 understanding of contributory infringement, and the language of the two provisions creates the same difficult interpretive choice.  It would thus be strange to hold that knowledge of the relevant patent is needed under §271(c) but not under §271(b).

Accordingly, we now hold that induced infringement under §271(b) requires knowledge that the induced acts constitute patent infringement.

## III

Returning to Pentalpha's principal challenge, we agree that deliberate indifference to a known risk that a patent exists is not the appropriate standard under §271(b).  We nevertheless affirm the judgment of the Court of Appeals because the evidence in this case was plainly sufficient to support a finding of Pentalpha's knowledge under the doctrine of willful blindness.

## A

The doctrine of willful blindness is well established in criminal law.  Many criminal statutes require proof that a defendant acted knowingly or willfully, and courts applying the doctrine of willful blindness hold that defendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances.  The traditional rationale for this doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge.  Edwards, The Criminal Degrees of Knowledge, 17 Mod. L. Rev. 294, 302 (1954) (hereinafter Edwards) (observing on the basis of English authorities that "up to the present day, no real doubt has been cast on the proposition that [willful blindness] is as

culpable as actual knowledge"). It is also said that persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts. See *United States* v. *Jewell*, 532 F. 2d 697, 700 (CA9 1976) (en banc).

This Court's opinion more than a century ago in *Spurr* v. *United States*, 174 U. S. 728 (1899),[6] while not using the term "willful blindness," endorsed a similar concept. The case involved a criminal statute that prohibited a bank officer from "willfully" certifying a check drawn against insufficient funds. We said that a willful violation would occur "if the [bank] officer purposely keeps himself in ignorance of whether the drawer has money in the bank." *Id.*, at 735. Following our decision in *Spurr*, several federal prosecutions in the first half of the 20th century invoked the doctrine of willful blindness.[7] Later, a 1962 proposed draft of the Model Penal Code, which has since become official, attempted to incorporate the doctrine by

———————

[6] The doctrine emerged in English law almost four decades earlier and became firmly established by the end of the 19th century. Edwards 298–301. In American law, one of the earliest references to the doctrine appears in an 1882 jury charge in a federal prosecution. In the charge, the trial judge rejected the "great misapprehension" that a person may "close his eyes, when he pleases, upon all sources of information, and then excuse his ignorance by saying that he does not see anything." See *United States* v. *Houghton*, 14 F. 544, 547 (DC NJ).

[7] *United States* v. *Yasser*, 114 F. 2d 558, 560 (CA3 1940) (interpreting the crime of knowingly and fraudulently concealing property belonging to the estate of a bankrupt debtor to include someone who "closed his eyes to facts which made the existence of" the receiver or trustee "obvious"); *Rachmil* v. *United States*, 43 F. 2d 878, 881 (CA9 1930) *(per curiam)* (same); *United States* v. *Erie R. Co.*, 222 F. 444, 448–451 (DC NJ 1915) (approving a "willful ignorance" jury instruction to a charge that a rail carrier knowingly granted a concession to a shipper); *Grant Bros. Constr. Co.* v. *United States*, 13 Ariz. 388, 400, 114 P. 955, 959 (1911) (interpreting the crime of knowingly encouraging the importation of contract laborers to include those who "willfully and intentionally ignored facts and circumstances known to them, which would have led to [actual] knowledge").

defining "knowledge of the existence of a particular fact" to include a situation in which "a person is aware of a high probability of [the fact's] existence, unless he actually believes that it does not exist." ALI, Model Penal Code §2.02(7) (Proposed Official Draft 1962). Our Court has used the Code's definition as a guide in analyzing whether certain statutory presumptions of knowledge comported with due process. See *Turner* v. *United States*, 396 U. S. 398, 416–417 (1970); *Leary* v. *United States*, 395 U. S. 6, 46–47, and n. 93 (1969). And every Court of Appeals— with the possible exception of the District of Columbia Circuit, see n. 9, *infra*—has fully embraced willful blindness, applying the doctrine to a wide range of criminal statutes.

Given the long history of willful blindness and its wide acceptance in the Federal Judiciary, we can see no reason why the doctrine should not apply in civil lawsuits for induced patent infringement under 35 U. S. C. §271(b).[8]

Pentalpha urges us not to take this step, arguing that §271(b) demands more than willful blindness with respect to *the induced acts* that constitute infringement. See Reply Brief for Petitioners 13–14. This question, however, is not at issue here. There is no need to invoke the doctrine of willful blindness to establish that Pentalpha knew that the retailers who purchased its fryer were selling that product in the American market; Pentalpha was indisputably aware that its customers were selling its product in this country.

---

[8] Unlike the dissent, we do not think that utilitarian concerns demand a stricter standard for knowledge under §271(b), see *post*, at 3 (opinion of KENNEDY, J.). The dissent does not explain—nor can we see—why promoting " 'the Progress of Science and useful Arts,' " *ibid.*, requires protecting parties who actively encourage others to violate patent rights and who take deliberate steps to remain ignorant of those rights despite a high probability that the rights exist and are being infringed, see *infra*, at 13–14.

Pentalpha further contends that this Court in *Grokster* did not accept the Solicitor General's suggestion that Grokster and StreamCast could be held liable for inducing the infringement of copyrights under a theory of willful blindness. Reply Brief for Petitioners 14 (citing Brief for United States, O. T. 2004, No. 04–480, pp. 29–30). But the Court had no need to consider the doctrine of willful blindness in that case because the Court found ample evidence that Grokster and StreamCast were fully aware—in the ordinary sense of the term—that their file-sharing software was routinely used in carrying out the acts that constituted infringement (the unauthorized sharing of copyrighted works) and that these acts violated the rights of copyright holders. See 545 U. S., at 922–927, 937–940.

### B

While the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.[9] We think these

---

[9] *United States* v. *Pérez-Meléndez*, 599 F. 3d 31, 41 (CA1 2010); *United States* v. *Svoboda*, 347 F. 3d 471, 477–478 (CA2 2003); *United States* v. *Stadtmauer*, 620 F. 3d 238, 257 (CA3 2010); *United States* v. *Schnabel¸* 939 F. 2d 197, 203 (CA4 1991) ("The willful blindness in-struction allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him"); *United States* v. *Freeman*, 434 F. 3d 369, 378 (CA5 2005); *United States* v. *Holloway*, 731 F. 2d 378, 380–381 (CA6 1984) *(per curiam)* (upholding jury in-struction on knowledge when "it prevent[ed] a criminal defendant from escaping conviction merely by deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct"); *United States* v. *Draves*, 103 F. 3d 1328, 1333 (CA7 1997) ("knowledge may in some circumstances be inferred from strong suspicion of wrongdoing coupled with active indifference to the truth"); *United States* v. *Florez*, 368 F. 3d

requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. See G. Williams, Criminal Law §57, p. 159 (2d ed. 1961) ("A court can properly find wilful blindness only where it can almost be said that the defendant actually knew"). By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, see ALI, Model Penal Code §2.02(2)(c) (1985), and a negligent defendant is one who should have known of a similar risk but, in fact, did not, see §2.02(2)(d).

The test applied by the Federal Circuit in this case departs from the proper willful blindness standard in two important respects. First, it permits a finding of knowledge when there is merely a "known risk" that the induced acts are infringing. Second, in demanding only "deliberate indifference" to that risk, the Federal Circuit's test does not require active efforts by an inducer to avoid knowing about the infringing nature of the activities.

In spite of these flaws, we believe that the evidence when viewed in the light most favorable to the verdict for SEB is sufficient under the correct standard. The jury could have easily found that before April 1998 Pentalpha willfully blinded itself to the infringing nature of the sales it encouraged Sunbeam to make.[10]

———————

1042, 1044 (CA8 2004) ("Ignorance is deliberate if the defendant was presented with facts that put her on notice that criminal activity was particularly likely and yet she intentionally failed to investigate those facts"); *United States* v. *Heredia*, 483 F. 3d 913, 917, 920 (CA9 2007) (en banc); *United States* v. *Glick*, 710 F. 2d 639, 643 (CA10 1983); *United States* v. *Perez-Tosta*, 36 F. 3d 1552, 1564 (CA11 1994). But see *United States* v. *Alston-Graves*, 435 F. 3d 331, 339–341 (CADC 2006).

[10] The District Court did not instruct the jury according to the stan-

SEB's cool-touch fryer was an innovation in the U. S. market when Pentalpha copied it. App. to Brief for Respondent 49. As one would expect with any superior product, sales of SEB's fryer had been growing for some time. *Ibid.* Pentalpha knew all of this, for its CEO and president, John Sham, testified that, in developing a product for Sunbeam, Pentalpha performed "market research" and "gather[ed] information as much as possible." App. 23a. Pentalpha's belief that SEB's fryer embodied advanced technology that would be valuable in the U. S. market is evidenced by its decision to copy all but the cosmetic features of SEB's fryer.

Also revealing is Pentalpha's decision to copy an overseas model of SEB's fryer. Pentalpha knew that the product it was designing was for the U. S. market, and Sham— himself a named inventor on numerous U. S. patents, see *id.*, at 78a–86a—was well aware that products made for overseas markets usually do not bear U. S. patent markings, App. in No. 2009–1099 etc. (CA Fed.), pp. A–1904 to A–1906. Even more telling is Sham's decision not to inform the attorney from whom Pentalpha sought a right-to-use opinion that the product to be evaluated was simply a knockoff of SEB's deep fryer. On the facts of this case, we cannot fathom what motive Sham could have had for withholding this information other than to manufacture a claim of plausible deniability in the event that his company was later accused of patent infringement. Nor does Sham's testimony on this subject provide any reason to

_____

dard we set out today, see App. to Brief for Respondent 26–27, and Pentalpha asks us to remand the case so it can move for a new trial. We reject that request. Pentalpha did not challenge the jury instructions in the Court of Appeals, see Brief for Appellants in No. 2009–1099 etc. (CA Fed.), pp. 21–22, and that court did not pass upon the issue. Finding no "exceptional" circumstances in this case, we follow our usual course and refuse to consider the issue. See *Youakim* v. *Miller*, 425 U. S. 231, 234 (1976) *(per curiam).*

doubt that inference. Asked whether the attorney would have fared better had he known of SEB's design, Sham was nonresponsive. All he could say was that a patent search is not an "easy job" and that is why he hired attorneys to perform them. App. 112a.

Taken together, this evidence was more than sufficient for a jury to find that Pentalpha subjectively believed there was a high probability that SEB's fryer was patented, that Pentalpha took deliberate steps to avoid knowing that fact, and that it therefore willfully blinded itself to the infringing nature of Sunbeam's sales.

\* \* \*

The judgment of the United States Court of Appeals for the Federal Circuit is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–6

_____

GLOBAL-TECH APPLIANCES, INC., ET AL.,
PETITIONERS *v.* SEB S. A.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[May 31, 2011]

JUSTICE KENNEDY, dissenting.

The Court is correct, in my view, to conclude that 35 U. S. C. §271(b) must be read in tandem with §271(c), and therefore that to induce infringement a defendant must know "the induced acts constitute patent infringement." *Ante*, at 10.

Yet the Court does more. Having interpreted the statute to require a showing of knowledge, the Court holds that willful blindness will suffice. This is a mistaken step. Willful blindness is not knowledge; and judges should not broaden a legislative proscription by analogy. See *United States* v. *Jewell*, 532 F. 2d 697, 706 (CA9 1976) (en banc) (Kennedy, J., dissenting) ("When a statute specifically requires knowledge as an element of a crime, however, the substitution of some other state of mind cannot be justified even if the court deems that both are equally blameworthy") In my respectful submission, the Court is incorrect in the definition it now adopts; but even on its own terms the Court should remand to the Court of Appeals to consider in the first instance whether there is sufficient evidence of knowledge to support the jury's finding of inducement.

The Court invokes willful blindness to bring those who lack knowledge within §271(b)'s prohibition. Husak & Callender, Wilful Ignorance, Knowledge, and the "Equal

Culpability" Thesis: A Study of the Deeper Significance of the Principle of Legality, 1994 Wis. L. Rev. 29, 35; see also L. Alexander & K. Ferzan, Crime and Culpability: A Theory of Criminal Law 34–35 (2009) (cautioning against the temptation to "distort" cases of willful blindness "into cases of knowledge"); G. Williams, Criminal Law: The General Part §57, p. 157 (2d ed. 1961). The Court's definition of willful blindness reveals this basic purpose. One can believe that there is a "high probability" that acts might infringe a patent but nonetheless conclude they do not infringe. *Ante*, at 14; see also *ibid.* (describing a willfully blind defendant as one "who can almost be said to have actually known the critical facts"). The alleged inducer who believes a device is noninfringing cannot be said to know otherwise.

The Court justifies its substitution of willful blindness for the statutory knowledge requirement in two ways, neither of which is convincing.

First, the Court appeals to moral theory by citing the "traditional rationale" that willfully blind defendants "are just as culpable as those who have actual knowledge." *Ante*, at 10. But the moral question is a difficult one. Is it true that the lawyer who knowingly suborns perjury is no more culpable than the lawyer who avoids learning that his client, a criminal defendant, lies when he testifies that he was not the shooter? See Hellman, Willfully Blind for Good Reason, 3 Crim. L. & Philosophy 301, 305–308 (2009); Luban, Contrived Ignorance, 87 Geo. L. J. 957 (1999). The answer is not obvious. Perhaps the culpability of willful blindness depends on a person's reasons for remaining blind. *E.g.*, *ibid.* Or perhaps only the person's justification for his conduct is relevant. *E.g.*, Alexander & Ferzan, *supra*, at 23–68. This is a question of morality and of policy best left to the political branches. Even if one were to accept the substitution of equally blameworthy mental states in criminal cases in light of the retribu-

tive purposes of the criminal law, those purposes have no force in the domain of patent law that controls in this case. The Constitution confirms that the purpose of the patent law is a utilitarian one, to "promote the Progress of Science and useful Arts," Art. I, §8, cl. 8.

Second, the Court appeals to precedent, noting that a "similar concept" to willful blindness appears in this Court's cases as early as 1899. *Ante*, at 11. But this Court has never before held that willful blindness can substitute for a statutory requirement of knowledge. *Spurr* v. *United States*, 174 U. S. 728, 735 (1899), explained that "evil design may be presumed if the [bank] officer purposefully keeps himself in ignorance of whether the drawer has money in the bank or not, or is grossly indifferent to his duty in respect to the ascertainment of that fact." The question in *Spurr* was whether the defendant's admitted violation was willful, and with this sentence the Court simply explained that wrongful intent may be inferred from the circumstances. It did not suggest that blindness can substitute for knowledge. Neither did *Turner* v. *United States*, 396 U. S. 398 (1970), or *Leary* v. *United States*, 395 U. S. 6 (1969). As the Court here explains, both cases held only that certain statutory presumptions of knowledge were consistent with due process. *Ante*, at 12. And although most Courts of Appeals have embraced willful blindness, counting courts in a circuit split is not this Court's usual method for deciding important questions of law.

The Court appears to endorse the willful blindness doctrine here for all federal criminal cases involving knowledge. It does so in a civil case where it has received no briefing or argument from the criminal defense bar, which might have provided important counsel on this difficult issue.

There is no need to invoke willful blindness for the first time in this case. Facts that support willful blindness are

often probative of actual knowledge. Circumstantial facts like these tend to be the only available evidence in any event, for the jury lacks direct access to the defendant's mind. The jury must often infer knowledge from conduct, and attempts to eliminate evidence of knowledge may justify such inference, as where an accused inducer avoids further confirming what he already believes with good reason to be true. The majority's decision to expand the statute's scope appears to depend on the unstated premise that knowledge requires certainty, but the law often permits probabilistic judgments to count as knowledge. Cf. *Connecticut Mut. Life Ins. Co.* v. *Lathrop*, 111 U. S. 612, 620 (1884) (Harlan, J.) ("[B]eing founded on actual observation, and being consistent with common experience and the ordinary manifestations of the condition of the mind, it is knowledge, so far as the human intellect can acquire knowledge, upon such subjects").

The instant dispute provides a case in point. Pentalpha copied an innovative fryer. The model it copied bore no U. S. patent markings, but that could not have been a surprise, for Pentalpha knew that a fryer purchased in Hong Kong was unlikely to bear such markings. And Pentalpha failed to tell the lawyer who ran a patent search that it copied the SEB fryer. These facts may suggest knowledge that Pentalpha's fryers were infringing, and perhaps a jury could so find.

But examining the sufficiency of the evidence presented in the 5-day trial requires careful review of an extensive record. The trial transcript alone spans over 1,000 pages. If willful blindness is as close to knowledge and as far from the "knew or should have known" jury instruction provided in this case as the Court suggests, then reviewing the record becomes all the more difficult. I would leave that task to the Court of Appeals in the first instance on remand.

For these reasons, and with respect, I dissent.